IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
June 2, 2010 Session

**RICK D. HANEBUTT v. STATE OF TENNESSEE**

**Direct Appeal from the Criminal Court for Carroll County**
**No. 04CR49-PC      Donald Parish, Judge**

_____

**No. W2009-01346-CCA-R3-PC  - Filed November 9, 2010**

_____

The petitioner, Rick D. Hanebutt, appeals the Carroll County Circuit Court's denial of his petition for post-conviction relief. The petitioner is currently serving concurrent sentences of life and twenty years for his convictions for first degree murder and attempted first degree murder. On appeal, the petitioner contends that the trial court erred in: (1) denying his motion to continue the post-conviction hearing; and (2) denying his petition for post-conviction relief. He contends that the court erred in denying relief because he claims he was denied his right to the effective assistance of counsel. Specifically, he contends that trial counsel was ineffective in failing to: (1) investigate the case and present viable witnesses, proof, and argument as to self-defense; (2) obtain a ballistics expert; (3) obtain unadulterated copies of phone records and obtain the phone records of another witness; (4) properly impeach a witness with inconsistent evidence, statements, and testimony; (5) contest the search warrant; (6) renew a motion to change venue; (7) object to statements made by the prosecution during voir dire; and (8) request additional jury instructions on drug usage and witness credibility. He further contends that the cumulative effect of all the alleged errors supports a finding of ineffective assistance of counsel. Following a thorough review of the record before us, we find no error and affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which DAVID H. WELLES and CAMILLE R. MCMULLEN, JJ., joined.

Matthew M. Maddox, Huntingdon, Tennessee, for the appellant, Rick D. Hanebutt.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Hansel McCadams, District Attorney General; and Beth Hall, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## Factual Background

The underlying facts of the case, as summarized by this court on direct appeal, are as follows:

The proof at trial reflects that the victim, David Tanksley, was shot and killed in November of 2003. At trial, Agent Brian Byrd of the Tennessee Bureau of Investigation (TBI) testified that he became involved with the case around December 10, 2003, after he received information of a possible homicide in Carroll County. According to Agent Byrd, he received information from Karla Abbot that the homicide occurred at Leland Holland's Auto Salvage, and Leland Holland, Tenesha Davies, and a man by the name of "Rick" were involved. Agent Byrd also discovered that the victim, David Tanksley, had been reported missing by his family.

Agent Byrd testified that during the course of the homicide investigation, he talked with Davies. After the discussion, Davies provided Agent Byrd with her own typed statement. From this statement, Agent Byrd interviewed Holland. During this interview, Holland divulged information about the victim's death and where the victim's body was located. Thereafter, Holland led police to the victim's body which had been discarded in Beach River. According to Agent Byrd, the victim's body was wrapped in a brownish tarp and was floating in the water, held by a root structure extending out of the river bank. The victim's body was then removed from the river and transported to the medical examiner for autopsy and identification.

Agent Byrd testified that after discovering the victim's body, police arrested Holland. Davies was not arrested at this time because she claimed that her involvement in the homicide was the result of being coerced and kidnapped. However, after review of the evidence collected, Davies and the [petitioner] were also charged with the homicide. Agent Byrd also testified that during the investigation he and other police officers collected a UT shirt with blood stains on it, two pistols, and an SKS rifle.

On cross-examination, Agent Byrd acknowledged that during the course of his investigation he discovered that the victim had several altercations with police and was considered dangerous when under the influence of methamphetamine. On recross-examination, Agent Byrd stated that Davies and Holland appeared somewhat desperate when interviewed, whereas the [petitioner] was lucid and thoughtful during his interview.

Lawrence James, a forensic scientist with the TBI, testified that he conducted DNA testing on the UT shirt. Although his testing confirmed that the blood on the shirt was human blood, the testing did not reveal a DNA profile. James explained that the reason for this result was because the shirt had been exposed to the weather.

Timothy Meggs of the Carroll County Sheriff's Department testified that he and other officers conducted a search of the [petitioner's] house. During this search, they found two walkie-talkie radios, a twenty-two rifle, a SKS rifle, a sixteen-gauge shotgun, some drugs and drug paraphernalia.

Tenesha Davies testified that she was currently being held in jail for the murder of David Tanksley. She had negotiated an agreement with the District Attorney's Office to testify truthfully against the [petitioner] and Holland. In exchange for her testimony, she would plead guilty to facilitation of murder and serve a twelve[-]year sentence in the Department of Correction.

Davies testified that at the time of the murder, she was going to college to become a nurse. However, she was selling drugs to make money while she went to college. According to Davies, she knew Holland because they did drugs together for about two years. She knew the [petitioner] because he worked for Holland and often stayed with Holland or her friend Didi. She knew the victim because he was long-time friend of her ex-husband. Davies testified that she sold dope and methamphetamine and her contract with Holland was drug related. Davies related that she, Holland, the [petitioner], and the victim were all drug users and the drug activity centered around either Holland's house or his salvage shop which was located about a mile from Holland's house.

Davies testified that she received a call from Holland asking her for some methamphetamine. She had some so she arranged a meeting at his house. While driving to Holland's house, she observed Didi's jeep parked in an unusual location near the gate to Holland's shop. Therefore, Davies picked up Holland at his house and they drove back to Holland's shop. When they arrived at the shop, Holland and Davies went around to the back where they saw the [petitioner] standing near the driver's side of a gray Ford F-150. Davies then saw the victim was sitting in the truck with one hand on the wheel and the other hand near the ignition. The victim was wearing a light colored sweatshirt that had a Tennessee football print on it. The driver side window was rolled down and the [petitioner] and the victim were arguing and exchanging expletives. The [petitioner] told the victim "[F]**k you. You're not taking the truck." The victim responded with "F**k you, yes, I am." While the victim was trying to start the truck, the [petitioner] took a chrome and black handgun and pointed it at the victim's head. Davies then heard a gunshot and the [petitioner] say, "You're not going anywhere." She and Holland then ran away, got into her car, and drove back to Holland's house. Once they arrived at the house, Davies asked Holland if they were going to call the police. Holland told her no because the police "were already hot on him for methamphetamines" and he did not want to involve them.

Davies testified that she and Holland drove back to the shop to see what the

[petitioner] was doing. As they peered through the gate located about thirty yards from the shop, they saw the victim's body lying on the ground leaned against the back tire of the truck. The [petitioner] had left so Davies and Holland drove to the [petitioner's] house. Upon arrival, Davies noticed that there were a lot of cars parked outside. She went inside the house and Holland stayed outside to talk to the [petitioner] privately. Later, Holland and the [petitioner] came into the house and the [petitioner] gave his guns to a woman named Kathy, telling her to get rid of them. Afterward, Holland and Davies left and went back to Holland's house. Holland and Davies stayed at the house for about an hour smoking dope when Karla Abbott arrived. While everyone was smoking dope, the [petitioner] appeared and yelled, "[t]he mother f**ker just won't die." At the time, the [petitioner] was dressed in army fatigues, he had purple latex gloves on his hands, and he was carrying a SKS rifle with the blade extended.

Davies testified that the next morning, the [petitioner] wanted her to accompany him to the shop and help discard the victim's body. The [petitioner] told Davies that they were going to use her car to haul the victim's body away from the shop. However, when they arrived at the shop, Davies saw that the victim was still alive, sitting on a dirt embankment with his knees drawn up and his arms wrapped around his knees. He was moaning and rocking back and forth. Davies saw that the victim had a hole in the front of his head and the back of his head was swollen. Upon seeing the victim alive, the [petitioner] stated "We've got to do something." The [petitioner] went inside the shop and poured some ether on a rag and held it to the victim's face. The victim responded by jumping up and screaming for his brother to help. As he moved up a small hill, the victim stated that he felt cold and could not see. While the victim was moving around, the [petitioner] picked up a large stick or 2X4 and hit the victim three times in the head until the victim fell down. Davies saw that the victim was bleeding profusely out of the back of his head and appeared unconscious.

According to Davies, she and the [petitioner] left the victim once again and went back to the [petitioner's] house. Later, Holland arrived and proceeded to discuss with the [petitioner] how to remove the victim from his property. The [petitioner] decided that the victim's body should be dumped into the river. Some eighteen hours after the [petitioner] and Holland left, the [petitioner] called Davies and told her that Holland's wife, Janet, and the victim's brother, Vincent Tanksley, needed to be killed in order to keep the victim's murder a secret. The [petitioner] wanted Davies to help. In response, Davies told the [petitioner] that she "wasn't going on no f**cking sprees with him." Davies stated that the [petitioner] told her that he had to shoot the victim again and described this action as a "mercy killing" because the victim was in so much pain. Davies also stated that the [petitioner] left messages on her phone asking her to meet him, but she never did. Davies further stated that she did not tell anyone about the murder because she was scared. On

cross-examination, Davies admitted that she was "high the whole time."

Jesse James testified that he was hanging out at the [petitioner's] house one night when the [petitioner] told him and others that he shot the victim. The next morning, the [petitioner] told James that he went back to the shop and the victim was still alive. The [petitioner] then asked James what to do. James responded with "I wouldn't go back." James also told the [petitioner] that he should not have told him about the situation and that he did not want to hear anymore about it. The [petitioner] then left the house, but when he came back later, he told James that he "took care of it."

Karla Abbott testified that she was hanging out at Holland's house when the [petitioner] came through the door exclaiming, "The mother f**ker won't die." The [petitioner] was wearing camouflage clothing, army boots and purple latex gloves. He was carrying an SKS rifle with an extended blade. After the [petitioner's] statement, Holland jumped up from his seat and he and the [petitioner] left the house. Abbott stated that Davies then told her to let whatever she just heard "go in one ear and out the other." Later, the [petitioner] and Holland came back inside the house and retrieved a couple of two-way radios. Abbott stated that the [petitioner] never acknowledged her and she left shortly thereafter.

Abbott testified that on a Saturday around midnight Holland and the [petitioner] came to her house. She observed that Holland was clearly agitated with the [petitioner]. The [petitioner] warned Abbott not to talk. The [petitioner] then led Abbott to his truck and showed Abbott the victim, who was lying in the bed of the truck along with garbage and 2X4s. The [petitioner] told Abbott that if she said a word, the same thing would happen[] to her and her three children. Abbott stated that Holland calmed her down and told her everything would be all right. Afterward, the two men left.

Abbott recalled that on Monday night, the [petitioner] stopped by again and wanted to talk. He brought with him beer and his SKS rifle. He asked her if she would keep her word. She told him that her word was "rock solid." The [petitioner] then proceeded to tell her what he did to the victim. He told her that the victim wanted to borrow his truck. When the [petitioner] told him no, he saw the victim reach into his pocket as if reaching for a gun. However, the [petitioner] moved faster than the victim and shot the victim in the head. The [petitioner] told Abbot that he thought the victim was dead. Later on, however, he realized that the victim was not dead so he tried to smother the victim with a rag soaked in ether. In response, the victim struggled and kept calling for his brother, Vince. The [petitioner] then camped out and watched the victim that night. The [petitioner] told Abbot that he used a 2X4 to finish the victim off and hit the victim in the back of the head with it. However, the victim did not die and so later on the [petitioner] took the victim

somewhere else and shot the victim again. Abbott stated that during this conversation, the [petitioner] attempted to call Davies a number of times and left threatening messages when she would not answer her phone. The [petitioner] also cut Abbott's phone lines because he did not want her to speak with anyone. The [petitioner] eventually left the following morning.

Abbott testified that on Tuesday night the [petitioner] stopped by again and brought with him a man called "Little Dave." They wanted to talk. Abbott stated that the [petitioner] was carrying the SKS rifle and two pistols, one silver and one black. Abbott said Little Dave also had a pistol. They asked her if she had talked with anyone. She told them no. The [petitioner] repeated his threat to kill her and her children if she said anything about the murder and left after three or four hours. Abbott stated that she felt threatened. After the [petitioner] and Little Dave left, she contacted Steve Lee, the District Attorney, and related to him what the [petitioner] had told her. Lee asked Abbott to invite the [petitioner] back to her home in order to get the [petitioner] to admit to killing the victim on tape. Abbott stated that they attempted to tape her conversation with the [petitioner] twice, but both attempts failed.

David Pinson testified that he worked at Holland's Auto Salvage with the [petitioner]. As he was traveling to Holland's house he saw a black jeep with the doors open parked by the gate. He did not see anyone around and thought it was strange. Later, while Pinson was at the [petitioner's] house, the [petitioner] walked up to him and said, "It's done." Pinson testified that at the time, he did not understand what the [petitioner's] statement meant, but thought it might relate to problems the [petitioner] was having with the victim. Pinson knew that the [petitioner] had been angry at the victim in the past.

Pinson testified that about a week later the [petitioner] approached him and attempted to talk to him about shooting the victim. Pinson told him that it was not his business and did not want to hear about it. Nonetheless, the [petitioner] told Pinson that he shot the victim at the shop and then had to shoot him again later. Pinson explained that his nickname was "Little Dave." He recalled that he went with the [petitioner] to Abbott's house. However, Pinson recalled that the conversation with Abbott was friendly. "Everybody was smiles and laughs and talking." Pinson admitted, however, that the [petitioner] brought the SKS rifle with him. On cross-examination, Pinson stated that the victim carried a black nine-millimeter handgun every time he saw him. Pinson also admitted he did not mention the fact that the [petitioner] said he shot the victim a second time in any prior statement though he could not recall why he did not mention this fact.

Dr. Teresa Campbell, a forensic pathologist, testified that the victim died of multiple gunshot wounds to the head. Dr. Campbell stated that from her

-6-

examination, the type of weapon used remained undetermined. However, Dr. Campbell explained that the nature of the gunshot wound to the front of the victim's head indicated it was caused by a lower velocity weapon such as a handgun, while the wound to the back of the victim's head indicated a high velocity weapon such as a rifle or powerful handgun. Dr. Jennifer Love, a forensic anthropologist, testified similarly. Both Dr. Campbell and Dr. Love stated that they could not rule out the possibility that the victim received injury by blunt force trauma.

In his own defense, the [petitioner] testified about the events that led up to his working for Holland's Auto Salvage and the circumstances surrounding the victim's death. The [petitioner] admitted that he did not get along with the victim, but he claimed that "[t]here was not the animosity that everybody [said] there was." The [petitioner] said that the victim was known to carry either a pistol or some other kind of weapon. According to the [petitioner], he discovered the victim inside the shop attempting to take some salvage parts from a customer's vehicle. Being suspicious of the victim, the [petitioner] told him to leave the shop. The victim then went to a truck and opened the door. At that moment, the [petitioner] saw the "pistol coming out," so he drew his own gun and fired. The victim fell to the ground. The [petitioner] then heard someone leave the driveway of the shop. The [petitioner] stated that he took the gun from the victim. He also stated that he did not call the police because he was scared and "[t]here was drugs around all the time."

The [petitioner] testified that he went to Holland's house to talk with Holland. He said that when he arrived, Davies and Abbott were there with Holland. The [petitioner] denied wearing purple latex gloves and carrying a SKS rifle. The [petitioner] recalled that he asked Kathy Franks to come over to his house. When she arrived, he gave her his guns. The [petitioner] stated that he believed that the victim was dead. According to the [petitioner], the next morning Davies came over to his house and the two of them drove back to the salvage shop. Upon arrival, they found the victim outside of the shop on the ground asleep. The [petitioner] went inside the shop and poured ammonia on a rag and waived it under the victim's nose in order to wake him up. It revived the victim but the fumes blinded him so the victim took off his shirt and started swinging it in "a defense mode." The [petitioner] said he was scared because the victim started walking toward him swinging his arms. The [petitioner] denied hitting the victim with a 2X4. Rather, he locked the shop because he did not want the victim getting inside, then he left with Davies to go see Holland. According to the [petitioner], the victim was still alive when they left the shop.

The [petitioner] testified that he went to Holland's house and knocked on the door, but eventually he went home after Holland would not answer. Later that evening, Holland and Davies came to his house. Holland wanted the victim's body removed from his property. While Davies got gas for the [petitioner's] truck, he and Holland went to the salvage yard. There, the [petitioner] found the victim [laying]

face down in the yard. Believing that the victim had finally died from the gunshot wound inflicted the previous day, the [petitioner] wrapped the victim's body in a tarp. The [petitioner] and Holland met up with Davies and filled the truck up with gas. Eventually, the [petitioner] and Holland drove to a secluded area and threw the victim's body in the river. The [petitioner] stated that he stopped by Abbott's after disposing of the victim's body, therefore, she did not see the victim in the truck. The [petitioner] also denied shooting the victim a second time but stated he did not know who did.

Agent Byrd was called as a rebuttal witness. He testified that Pinson did not tell him that the [petitioner] shot the victim a second time. Agent Byrd also testified that eventually police recovered a black truck thought to be the one involved in this homicide. However, no blood evidence or DNA was found in the truck. Tommy Decanter of the Sheriff's Department testified that Holland's neighbors filed complaints in which they claimed they heard multiple gunshots coming from the Holland residence on September 11th, 18th, and on December 18th, 2003.

Based upon the evidence presented, the jury found the [petitioner] guilty of first degree premeditated murder and attempted first degree premeditated murder. The trial court sentenced the [petitioner] to a total effective sentence of life imprisonment.

*State v. Rick Hanebutt*, No. W2005-01301-CCA-R3-CD (Tenn. Crim. App. at Jackson, Oct. 2, 2006). The petitioner then filed a direct appeal to this court, challenging: (1) the sufficiency of the evidence; (2) the State's compliance with discovery; and (3) the denial of his motion to change venue. *Id*. A panel of this court found the issues of sufficiency and discovery to be without merit and found the venue issue to be waived based upon a failure to renew the motion. *Id*. Nonetheless, the court concluded that, absent waiver, the issue was without merit because the [petitioner] had failed to show prejudice. *Id.* The petitioner's application to appeal to the Tennessee Supreme Court was subsequently denied.

Thereafter, on January 28, 2008, the petitioner filed a timely *pro se* petition for post-conviction relief alleging, among other grounds, that he was denied his Sixth Amendment right to the effective assistance of counsel. Post-conviction counsel was subsequently appointed and following several continuances granted because of difficulty obtaining the trial transcript, counsel filed an amended petition with the court on August 28, 2008. After the filing of the amended petition, post-conviction counsel was granted three additional continuances in order to investigate the case and to have an investigator find witnesses for the post-conviction hearing. Yet another motion to continue was filed by post-conviction counsel, which was opposed by the State. The post-conviction court denied the motion and post-conviction counsel's subsequent request for reconsideration, and the matter proceeded to a hearing on May 18, 2009.

At the hearing, ten witnesses were called to give testimony. First to testify was Ron Lax, an

investigator hired by the petitioner's family, who had attempted to find witnesses for the post-conviction hearing. Mr. Lax testified that of the fourteen names he was given, he had only been able to locate two witnesses. It was revealed, however, that post-conviction counsel had secured the presence of two more witnesses on the list. Additionally, Mr. Lax testified that he had exhausted the funds available for an investigation, even stating that he had served the potential witnesses on his own time.

Next, the petitioner called John Overton, the former Assistant District Attorney General who had tried the petitioner's case. Mr. Overton testified regarding a statement made in voir dire relating to the unusually high number of homicides pending in Carroll County at the time of trial. He stated that the pending cases were being discussed in the community and that he felt it was necessary to mention it in order to focus the prospective jurors on the instant case. However, he related that he did not feel this negatively affected the jury in the petitioner's case. Additionally, Mr. Overton stated that, despite pretrial publicity in the case, he did not recall much trouble in obtaining a jury.

Next, the petitioner called TBI Agent Brian Byrd, who had investigated the case. In response to questioning, he reiterated that the two gunshot wounds suffered by the victim came from two different types of weapons. The first wound was possibly linked to a 380 or a 9mm pistol, and the petitioner admitted using a 9mm pistol to inflict the first shot. Because of the condition of the body and other factors, no determination was made with the regard to the type of weapon used to fire the second shot other than that it was a higher velocity weapon than the one used in the first shot. While acknowledging that it might have been beneficial for the defense to know the exact caliber of the weapon used, Byrd testified that they were hampered in the investigation by a lack of bullets or fragments to compare in order to make that determination. He further noted that, while the State made inferences that the SKS rifle found in the petitioner's possession was consistent with the higher velocity weapon used, no direct proof was presented that the rifle was, in fact, the murder weapon. Agent Byrd went on to testify that trial counsel had extensively cross-examined him regarding differences in ammunition in an attempt to show that the gun which fired the second shot was also consistent with the AK47 which was seen in Holland's possession. He also testified that trial counsel had cross-examined him extensively with regard to the inconsistencies in the proof relating to Davies' statement that the victim was shot while inside the truck, namely that there was no blood or DNA evidence found. Finally, Agent Byrd testified with regard to cellular telephone records, which he had subpoenaed in the case based upon information received in the investigation. He explained that well into the investigation, he received information that Davies and Holland had been texting each other frequently during these events. However, by the time that he became aware of this information, the phone company had deleted those records. Additionally, he testified that the documentation he received from the phone company with regard to the telephone calls made, had portions of it blacked out by the phone company pursuant to their privacy policy. He stated that he believed that it had to do with the personal information of the account holder and that he did not feel it was relevant to the investigation. Finally, he testified that he shared the phone records with trial counsel and that trial counsel had questioned him regarding the blacked-out portion and was informed that there was no way to obtain the information. Additionally, he noted that the State was aware that Davies and Holland were sharing cell phones at the time.

Tommy Carlson was the next defense witness, and he testified with regard to a statement he had given concerning the murder. In the statement, he said that Davies told him about the murder, including that they had tortured and shot the victim. According to Carlson, although Davies did not specifically say who had fired the second shot at the victim, he got the impression "from the way she was talking" that Davies had been the shooter. He testified that no one from trial counsel's office had spoken with him about this statement.

Next to testify was Jonathan Caudill, who stated that, three to four months prior to the instant shooting, he had been involved in an altercation with the victim in which the victim had pulled a gun on him. He also testified that the defendant was aware of this incident. Caudill also stated that no one from trial counsel's office had contacted him.

Janet Petty, the petitioner's live-in girlfriend at the time of the murder, testified next. She stated that she knew the people involved in the incident and, further, that she did not like Davies, who was a heavy drug user. Petty testified that Davies was not a truthful person most of the time. She also testified that she did not have a "positive opinion" of Karla Abbott and that Abbott was the biggest "methhead" around. She also testified that David Pinson, whom she described as young and gullible, visited their house twice during this period and that she never heard him make a statement about the murder. Moreover, she testified that when Davies was at their home during this time, she did not appear to be under duress. While initially stating that she had not been contacted by anyone in trial counsel's office, Petty recalled during cross-examination that, prior to trial, she met with both the investigator and trial counsel. She also acknowledged that, during this time frame, she was drinking and using drugs regularly and that she did not recall everything.

The next witness called was trial counsel, who testified that he had been practicing law since 1977 and had tried many murder cases. Trial counsel stated that his office was appointed to represent the petitioner early in the case and that he was assisted by his investigator, Taz Gardner. Trial counsel testified that he had visited the petitioner approximately ten times in jail, talked to witnesses, prepared for trial, issued subpoenas, reviewed discovery, and discussed trial strategy at length with the petitioner. He acknowledged that the jail logs did not reflect this number of visits but stated that it was because of the way the logs were maintained at the time. Trial counsel specifically testified that, in his opinion, he and Gardener had met with the petitioner a sufficient number of times and that he was prepared for the trial.

According to trial counsel, the defense strategy in the case was to assert that the first shot, which the petitioner admitted firing, was done in self-defense and that the petitioner had not fired the second shot. One part of the strategy employed was to establish the violent nature of the victim. Trial counsel testified that Mr. Gardner interviewed multiple witnesses who had information regarding the victim's nature. However, because of varying problems with the witnesses, trial counsel elected to assert the self-defense theory through the petitioner's testimony. Additionally, he stated that he used the State's witnesses to show the victim's nature. Specifically, trial counsel was able to get the victim's prison records entered into evidence, and multiple witnesses testified that the victim was known to carry a gun. Additionally, Agent Byrd acknowledged that: the police knew

the victim to be dangerous; he was involved in the drug culture; he was wanted in California; and he had been involved in a separate shooting approximately one week before his death. However, trial counsel acknowledged that he did not present specific testimony that the petitioner was aware of an incident in which the victim had recently drawn a weapon on someone else.

With regard to the names given to trial counsel by the petitioner in order to establish the victim's violent nature, trial counsel reiterated that each was investigated to the best of their ability. He noted that most of these people were involved in the drug culture and were not eager to speak with them, assuming that they could be found. Specifically, with regard to Dennis Caudill, trial counsel testified that he made the decision not to call him because of the cumulative nature of his testimony, as he believed that there was enough evidence presented of the victim's violent nature. With regard to Tommy Carlson, trial counsel testified that he made a strategic decision not to call him because he would testify that the victim had been kicked and tortured by the petitioner and Davies. Moreover, in the statement, Carlson stated that Davies never specifically said that she fired the second shot; rather, it was only an impression that he had gotten. Trial counsel related that he discussed this strategy with the petitioner, although he acknowledged that the final decision was his. Trial counsel also acknowledged that he chose not to call Randy Cagle and Tim Wood, who witnessed the prior shooting of the victim, because he felt that offered no additional proof in the case.

Another witness whom trial counsel considered calling was Janet Petty, the petitioner's girlfriend. However, after speaking with her on numerous occasions, counsel had the impression that she was a "loose cannon." He specifically testified that he was afraid of what she might say on the stand if she was called to testify. With regard to Sherry Gilbert, trial counsel could not recollect why he chose not to use her as a witness concerning whether Holland had possession of the petitioner's SKS rifle, which the prosecution implied was used to fire the fatal shot.

Next, trial counsel testified regarding his decision not to employ a ballistics expert. He stated that the investigation of the facts led him to believe that an expert would not be helpful because of the extensive nature of the victim's wounds and the absence of any projectiles or shell casings. With regard to the search of the petitioner's house in an unrelated drug case, which yielded the weapons, trial counsel testified that he felt that the warrant was valid and saw no meritorious argument to offer to support a suppression. Trial counsel also testified regarding the change of venue motion which was filed and then reserved until trial. He acknowledged that he did not renew the motion after the jury was selected because he felt that they had gotten a good jury. He testified that he knew he was waiving the venue issue when he failed to renew it, but he stated that he believed the appellate court would address the issue regardless, which they did. Finally, trial counsel testified with regard to the cell phone records he received from the State. He stated that he did ask about the blacked-out portions and that he was satisfied with the answer he received from Agent Byrd. He acknowledged that, if the portion had contained information that Davies and Holland were on the account together, it would have reinforced the impression that the two were communicating with each other.

The next witness called by the petitioner was Sherry Gilbert, the victim's girlfriend. She

recalled an incident involving a weapon in which the victim, Randy Cagle, Tim Woods, and Boo Grissom were involved. She also testified regarding the SKS rifle found at the petitioner's home. She stated that the gun had originally belonged to the victim. Approximately three days before his death, she said the victim was angry and left their house. She testified that shortly thereafter, Holland called her and told her that the victim was demanding his gun be returned. However, she acknowledged that, at the time of the victim's murder, the petitioner had the SKS rifle in his possession. Furthermore, she stated that she had spoken with Taz Gardner, but she was unable to recall the discussion.

The final defense witness called was the petitioner. He began his testimony by stating that trial counsel never asked if wanted to renew the motion for change of venue and, further, that he would have wanted it done because of the publicity in the case and the involvement of a well-known family. He also testified that on three occasions, he asked trial counsel to employ a weapons expert. He contended that on the final occasion, trial counsel yelled at him for asking again. He testified that he wanted the expert to help show that the SKS was not the murder weapon. He also stated that trial counsel never discussed the possibility of filing a motion to suppress with regard to the search warrant issued in the drug case. However, when questioned about suppression, he was unable to state a reason why he believed a motion should have been filed. The petitioner also testified that he had asked trial counsel to obtain Davies' phone record prior to trial, but counsel never did. He also asserted that, in his opinion, those records would have indicated who fired the second shot.

The petitioner testified that trial counsel only visited him in jail on six occasions and that Taz Gardner visited twice with trial counsel and once by himself. The petitioner stated that he informed trial counsel of witnesses he wished to call in order to show the victim's violent nature. The petitioner indicated that trial counsel gave him the impression that he did not wish to use this proof, and the petitioner acknowledged that he did not insist that the witnesses be called. However, he testified at the hearing that he believed they would have helped at trial. He further elaborated that calling Jonathan Caudill, Tommy Carlson, and Janet Perry to testify would have shown that Davies and Holland had more of a motive for killing the victim than he did. He also asserted that he believed that the jury should have been specifically instructed on witness bias because of "a couple of things Ms. Abbott testified to . . . are preposterous."

Following his testimony, the petitioner's case rested. At this point, the State call Taz Gardner, the investigator for the Public Defender's Office. He testified that he visited the petitioner numerous times in jail and that they had developed a good working relationship. He stated that the petitioner had given him several names of possible witnesses and that he attempted to find all of them. However, he related that he was unable to find some and that some refused to speak with him. He recalled that, of the witnesses found, trial counsel had reservations about calling them because of their background.

Mr. Gardner also testified that he had investigated the ballistics in the case as best he could, given the information available, speaking with a medical doctor who was knowledgeable on the subject. However, he was unable to find any information which would indicate that the SKS rifle

was not the gun used in the shooting. He specifically testified that he did not believe that a ballistics expert would be necessary to disprove the use of the SKS rifle. He went on to state that trial counsel attempted to show in other ways that the gun was not the murder weapon in the case, *i.e.* giving the inference that Holland's AK47 was the murder weapon.

Finally, Mr. Gardner acknowledged that no subpoena was issued for Davies' phone records. However, he testified that they spent hours going over the phone records in their possession.

After hearing the evidence presented, the post-conviction court denied the petition by written order. The petitioner has now timely appealed that denial.

**Analysis**

On appeal, the petitioner contends that the post-conviction court erred in its denial of his petition because he was denied his right to the effective assistance of counsel. As a preliminary matter, the petitioner is also contending that the court erred in denying his motion to continue the post-conviction hearing.

**I. Denial of Motion to Continue**

The petitioner contests the denial of his motion, asserting that the denial violated his Due Process rights and resulted in actual prejudice to his presentation of the issues during the hearing. The decision to grant or deny a motion to continue rests within the sound discretion of the trial court and will not be overturned absent a clear showing that the court abused its discretion to the prejudice of the petitioner. *State v. Rimmer*, 250 S.W.3d 12, 40 (Tenn. 2008); *State v. Odom*, 137 S.W.3d 572, 589 (Tenn. 2004). When the movant contends that the denial of his motion denies him due process, he must show actual prejudice. *Odom*, 137 S.W.3d at 589. In order to show actual prejudice on appeal, the unsuccessful movant must demonstrate a reasonable probability that a different result would have followed had the continuance been granted. *State v. Hines*, 919 S.W.2d 573, 579 (Tenn. 1995).

The petitioner contends that he was prejudiced by this denial in that he was precluded from finding additional witnesses which could have testified at the hearing with regards to the victim's propensity for violence. He contends that he was denied his right to present these witnesses and allow the post-conviction court to consider their testimony on the ineffective assistance of counsel issue as it relates to the presentation of self-defense at the original trial. He further contends that it is especially important because he had the burden under the post-conviction statutes to present all witnesses at the hearing or be precluded from arguing that the witnesses which were not presented would have aided in establishing his ineffective assistance of counsel claim.

The original petition in this case was filed in January 2008. Subsequently, post-conviction counsel filed three motions to extend the time for filing the amended petition, which was ultimately filed in August 2008. The evidentiary hearing was thereafter scheduled for October 2008, but, on

October 14, post-conviction counsel filed a motion to continue, based upon his inability to obtain a transcript of the original trial. The court entered an order requiring the original court reporter to deliver the transcript at the next scheduled court date, January 12, 2009. On that date, counsel acknowledged receipt of the transcript, but he requested additional time to review it. The evidentiary hearing was reset for March 26, 2009.

On March 4, 2009, post-conviction counsel filed yet another motion to continue, referencing thirteen potential witnesses for the evidentiary hearing. Counsel stated in the motion that, although he had only found two of the thirteen possible witnesses, an extension of forty-five days "should be more than sufficient in securing the whereabouts of the witnesses sought by the petitioner." Pursuant to an agreed order, the evidentiary hearing was reset for May 18, 2009.

On May 7, the petitioner filed another motion for continuance, averring that eleven of the potential witnesses had still not been found. Counsel again requested an additional forty-five days to locate the witnesses. However, the court denied this motion, noting that "repeated continuances have been granted to the [petitioner] at his request since the matter was originally filed, now well more than a year ago, and the Court feels that [it is] time to bring closure to this matter." On May 15, counsel filed yet another motion seeking a continuance, in which he asserted that even if he found the possible witnesses, he would be unable to speak with them prior to the hearing without the continuance. The motion was denied by the court immediately prior to the commencement of the hearing on May 18. After reciting the procedural history, the court ruled:

> Now comes today an additional motion to continue the case. And the court believes it is not fair to the State or to the family of the victim involved in the case, when balanced against the interest of the [petitioner] to continue this matter further.
>
> The matter has now been pending approximately [fifteen] months. [That is] ample time to have prepared for this hearing today. So the motion to continue is respectfully denied.

On the record before us, we cannot conclude that the trial court abused its discretion in the denial of the motion. The court granted multiple extensions in the case and provided the petitioner with four different settings prior to the actual evidentiary hearing. We must agree with the court's conclusion in this case that the petitioner was afforded more than a reasonable opportunity to investigate and locate the missing witnesses. Based upon the petitioner's inability to locate the witnesses during the fifteen months that the case was pending, we fail to see how he can assert that the court's denial is an abuse of discretion. Moreover, he has failed to show actual prejudice in that he has failed to establish that granting yet another continuance would have achieved a different result in locating the witnesses, especially in light of his own investigator's testimony that he had exhausted all available funds. Further, he has made no showing that, even assuming the witnesses were found, their testimony would have affected the outcome of the proceedings. We would note that the petitioner's brief appears to assert that these witnesses should have been called at the original trial to establish the victim's propensity for violence; however, that testimony was presented by other

witnesses at the post-conviction hearing and had no affect on the post-conviction court's denial. As such, the petitioner is not entitled to relief.

## II. Ineffective Assistance of Counsel

Next, the petitioner contends that trial counsel was ineffective in a plethora of areas. Specifically, he contends that trial counsel was ineffective in: (1) failing to investigate the case and potential witnesses and to present viable witnesses, proof, and argument as to self-defense; (2) failing to obtain the services of a ballistics expert to counteract the implication that the petitioner's SKS rifle was the murder weapon; (3) failing to obtain unadulterated copies of phone records, relying only upon the phone records obtained through discovery, and failing to obtain the phone records of Davies; (4) failing to properly impeach Davies with inconsistent evidence, statements, and testimony; (5) failing to contest the search warrant in the drug case, which led to confiscation of the SKS rifle the State implied was the murder weapon; (6) failing to renew a motion to change venue, which led to the issue being waived on appeal; (7) failing to object to the assistant district attorney general's comment during voir dire, referencing other murders in the county; and (8) failing to request additional jury instructions on drug use and witness credibility. He further asserts that the cumulative effect of these errors undermines the confidence in the validity of the verdict in the original trial.

To succeed on a challenge of ineffective assistance of counsel, the petitioner bears the burden of establishing the allegations set forth in his petition by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). The petitioner must demonstrate that counsel's representation fell below the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Under *Strickland v. Washington*, 466 U.S. 668, 687 (1984), the petitioner must establish (1) deficient performance and (2) prejudice resulting from the deficiency. The petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably-based trial strategy, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). This deference to the tactical decisions of trial counsel is dependent upon a showing that the decisions were made after adequate preparation. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

It is unnecessary for a court to address deficiency and prejudice in any particular order or even to address both if the petitioner makes an insufficient showing on either. *Strickland*, 466 U.S. at 697. In order to establish prejudice, the petitioner must establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Burns*, 6 S.W.3d 453, 463 (Tenn. 1999) (quoting *Strickland*, 466 U.S. at 694).

The issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact. *Id*. at 461. "[A] trial court's findings of fact underlying a claim of ineffective assistance of counsel are reviewed on appeal under a *de novo* standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is

otherwise." *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001) (citing Tenn. R. App. P. 13(d); *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). However, conclusions of law are reviewed under a purely *de novo* standard with no presumption.

> **a.** **Failure to Investigate and present viable witnesses, proof, & argument as to self-defense**

On appeal, the petitioner is contending that trial counsel and his staff failed to properly investigate the case in general and, specifically, in relation to the self-defense position the petitioner was presenting at trial. The petitioner centers his "general failure" argument around the testimony given by Taz Gardner. He asserts that Gardner testified that "he did whatever it took to get ready for the case," but he "admitted that [the petitioner] gave him numerous names of people to locate and speak with and that he failed to do that." He further argues that this failure to investigate and interview witnesses was "of paramount concern as it relates to [the petitioner's] self-defense argument . . . [as] self-defense was the linchpin of [the petitioner's] defense." He notes that in "order to make a case for self-defense [the petitioner] had to believe in his mind that [the victim] was about to kill him or cause serious bodily injury to him" and asserts that "[trial counsel] failed to do this." His main complaint appears to be that trial counsel failed to call certain witnesses who had actual knowledge of incidents which could have established the victim's propensity for violence. He faults trial counsel for his decision to not present this directly but, instead, to rely on the petitioner's testimony and law enforcement's prior knowledge of the victim. Specifically, he cites trial counsel's failure to call Jonathan Caudill, Tommy Carlson, Randy Cagle, Tim Wood, Boo Grisson, and Sherry Gilbert to testify to specific instances of prior violence by the victim and their knowledge that the petitioner was aware of those incidents. He contends that if "proper proof [had been] presented on the self-defense issue the jury would have been more likely to have believed the version of events by [the petitioner]."

In denying relief on this issue, the post-conviction court made the following findings:

> The credible proof suggests that all reasonable efforts were made by trial counsel and his investigator to locate and interview witnesses. This included interviews of those witnesses who were identified by the State or whose identity was supplied by the [petitioner]. Trial counsel was aware of certain witnesses but decided not to call them. [Jonathan] Caudill was interviewed by Mr. Gardner. Mr. Caudill could have presented evidence regarding the violent disposition of the victim. However, trial counsel opted to prove this disposition by other, more credible, witnesses. In similar fashion, [trial counsel] decided not to call the witness, Tommy Carlson, because he would provide testimony detrimental to the petitioner. [Trial counsel] decided not to call Janet Petty as a witness because of her unreliability and his conclusion that she was a "loose cannon." This Court will not recount every line of testimony here, but after hearing the testimony and reviewing the record, the Court concludes that the decisions made by [trial counsel] were informed by a reasonable investigation and were not the result of a lack of skill nor preparation. Counsel's

-16-

performance was adequate.

Following review of the record, we find nothing that preponderates against the post-conviction court's findings. At the hearing, trial counsel testified that he took all steps necessary to prepare for the petitioner's trial, including utilizing Taz Gardner to locate witnesses on the petitioner's behalf. He stated that he consulted with witnesses, issued subpoenas, and discussed the strategy of the case with the petitioner. Mr. Gardner likewise testified that he had attempted to the best of his ability to track down every lead he received. The post-conviction court clearly accredited their testimony, a finding which is not in the province of this court to reweigh upon review.

Additionally, trial counsel testified that, upon review of the information he collected in the investigation, he made a strategic or tactical decision to establish the victim's propensity for violence through use of the petitioner's testimony and through cross-examination of certain State witnesses such as Agent Byrd, Dave Pinson, and Tenesha Davies, as well as through the victim's prison records which showed acts of violence committed during his incarceration. Trial counsel testified that he was aware of the witnesses whom the petitioner now asserts should have been called but stated that he felt that there were problems with calling those witnesses to testify. He specifically referenced that all of these witnesses were involved in the drug culture, which could taint their credibility. Additionally, he felt that while some of the testimony might be beneficial, other portions of what they would testify to would be harmful to the defense's case. As such, he made the decision to establish the victim's violent tendencies through other means. Trial counsel further testified that he believed the method he chose to employ sufficiently put the issue before the jury. The post-conviction court agreed, and, as noted, we find nothing in the petitioner's assertion to contradict that finding. Trial counsel made a reasonable tactical decision after adequate preparation and investigation and, as such, is not entitled to relief on this issue.

Additionally, we would note that of the six witnesses the petitioner now complains were not called, only three testified at the post-conviction hearing. A petitioner who alleges that trial counsel is ineffective for failing to call witnesses must present a material witness who could have been found after a reasonable investigation and would have testified favorably for the defense at the post-conviction hearing. *Black v. State*, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990). The petitioner has thus waived any argument with regard to the three witnesses he failed to call. Having previously determined that there was no abuse of discretion in the denial of the motion to continue the hearing in order to allow more time to find these witnesses, we conclude that the petitioner was bound by his burden and that his failure precludes review.

Moreover, of the three witnesses who testified at the hearing, only one offered testimony which directly related to the victim's propensity for violence. Caudill testified that the victim had pulled a gun on him three weeks earlier and that the petitioner was aware of that incident. However, Carlson's testimony was limited to his statement that, based upon a conversation with Davies, he got the impression she had fired the second shot and, further, that they had tortured the victim. Gilbert's testimony centered on the fact that the SKS rifle found in the petitioner's possession had belonged to the victim and that the victim had been in an altercation with Boo Grissom.

### b.       Failure to Obtain a Ballistics Expert

The petitioner contends that trial counsel was ineffective because he failed to obtain a ballistics expert who would help show that the SKS weapon taken from the petitioner's home could not have been the weapon used in the murder. The petitioner testified at the hearing that, on multiple occasions, he asked trial counsel to obtain the services of such an expert to no avail. The post-conviction court, in denying relief, found as follows:

> The petitioner vigorously contends that trial counsel should have endeavored to obtain a ballistics expert who might have cast doubt on the type of firearm used to fire the second or fatal shot. The petitioner said that an examination of the entrance and exit wounds on the skull of the victim might have ruled out any gun in his possession. Trial counsel did consider such a defense approach and investigated the likelihood of obtaining relevant information. The State was not able to definitely prove at trial the make or caliber of the ultimate murder weapon. Given this defect in the State's case, trial counsel made the decision not to pursue this theory and simply to rely upon a lack of evidence by the State. This decision was a reasonable exercise of trial strategy by defense counsel.

At the post-conviction hearing, trial counsel specifically testified that he had instructed his investigator, Taz Gardner, to investigate the possibility of obtaining a ballistics experts. However, because of the condition of the body and the missing pieces of skull, he was informed that an expert would probably not be able to help in excluding the SKS as the murder weapon. Additionally, Mr. Gardner was called to testify at the hearing and stated that he had spoken with a medical doctor whom he knew to be knowledgeable in ballistics and was informed that ballistics could not exclude the weapon with certainty. Based upon this information, trial counsel testified that he made a tactical decision not to procure an expert because the State was unable to prove that the SKS was the murder weapon. It is not the province of the courts to second-guess reasonable tactical decisions of trial counsel made during the course of a trial. *See Hellard*, 629 S.W.2d 4, 9.

We would further note that the petitioner has wholly failed to establish the prejudice prong of his claim. The petitioner failed to put forth any specific testimony or beneficial proof of what he would have found if trial counsel had utilized the services of a ballistics expert. It is the petitioner's burden to present this proof at the post-conviction hearing. *Black*, 794 S.W.2d at 757. This issue is without merit.

### c.       Failure to Obtain Phone Records

Next, the petitioner is asserting that trial counsel provided ineffective assistance based upon his handling of the phone records involved in this case. According to the petitioner, it was bad practice for trial counsel to rely upon the information provided by the State, *i.e.* the phone records and their explanation of the blacked out portions, instead of conducting his own investigation and

obtaining the information himself. He contends that trial counsel should not have merely accepted Agent Byrd's explanation that the blacked out portion was done by the phone company and that those portions contained only personal information. The petitioner asserts that trial counsel "accepted the information from the Government on blind faith and disregarded his obligation to verify, confirm, and discover from other sources what the blacked out information was and then determine whether it would have benefitted the defense." He also complains that trial counsel failed to obtain Davies' phone records and offered no reason for the failure. According to the petitioner, "[t]his dereliction of duty to his client is the epitome of ineffective assistance of counsel." The post-conviction court disagreed, as do we.

In its written order denying relief, the post-conviction court stated:

In fact, certain cell phone records of Tenesha Davies were obtained by the State and delivered to trial counsel during routine discovery. Certain information had been "blacked out" on those records. [The petitioner] did not prove the nature of the "blacked out" information, if any. The State had no more information than that available to trial counsel. The petitioner seeks to fault trial counsel for not determining what, if any, information was "blacked out" by the phone company before producing the records. By the time this matter came to the attention of trial counsel the records had apparently been purged by the phone company. The petitioner had not demonstrated any prejudice to him on this point. Counsel's performance was adequate.

As an initial matter, we note that the petitioner has failed to offer any citation to authority in his brief which would support his assertion. Rule 10 of the Rules of the Tennessee Court of Criminal Appeals states that any issue raised should be supported by authority in the brief and that the failure to do so may result in waiver. Nonetheless, we review the issue and reach the conclusion that the post-conviction court's findings are supported.

Trial counsel testified at the post-conviction hearing that he had received the phone records of the parties involved through Rule 16 discovery from the State. He observed the blacked out portions, sought an explanation, and was told by Agent Byrd that the information was merely the account holder's personal information. Trial counsel testified that he saw no reason to question Agent Byrd with regard to this explanation, as he had previously worked with him on cases and trusted him. Counsel also explained that he had learned that the text messages he sought to procure were no longer available pursuant to the phone company policy at the time of purging the records after a set time. He further elaborated that the records he procured were useful in that they showed that Davies and Holland were in contact with each other during the time frame of the murder, while the petitioner's phone was not used. We would also note that this information was confirmed by Agent Byrd during his testimony at the hearing. We agree with the post-conviction court that trial counsel performed adequately under these facts. Trial counsel does not have a duty to re-request information which he already possessed and is allowed to assume the State had complied with full discovery. He sought an explanation for the blacked out information and was justified in relying

-19-

upon the information he received. Trial counsel sought to utilize the records in accordance with his defense. We feel these actions fall squarely within the "range of competence demanded of attorneys in criminal cases." *See Baxter v. Rose*, 523 S.W.2d at 936.

Moreover, as specifically noted by the post-conviction court, the petitioner failed to put forth any evidence of what was contained in the blacked out portion of the records, offering only mere speculation on how that information would have benefitted him at trial. It is the petitioner who bears the burden of showing such information in order to show his entitlement to relief. *See Black*, 794 S.W.2d at 757-58. Because of his failure to do so, the petitioner is precluded from establishing the prejudice prong of his ineffective assistance of counsel claim.

### d. Failure to Impeach Davies

The petitioner contends that trial counsel was also ineffective in that he failed to properly impeach Tenesha Davies, whom he characterizes as "very important to the case . . . and damaging to" the petitioner. He asserts that: (1) trial counsel could not impeach Davies with the phone records because of the blacked out information and the failure to obtain her phone records; (2) trial counsel failed to impeach Davies with the information that there was no blood or other evidence found inside the truck where she claimed the victim had been shot; and (3) trial counsel failed to investigate the inconsistencies in Davies' statements and testimony concerning another person she was with the night she purchased gas to help dispose of the body.

Trial counsel testified at the evidentiary hearing that he attempted to discredit Davies as best he could because it was very important to the defense. He specifically stated that he questioned Davies, as well as all the State's witnesses, with regard to their extensive experiences with drugs, pointing out that Davies was, in fact, a drug dealer. He elicited details that she had typed her own statement and had waited several months to provide that statement to authorities. He testified that he used the phone records in his possession to show that it was Davies and Holland who were communicating following the murder and that the petitioner had not used his own phone. Trial counsel also testified that, on cross-examination, he "hammered" the point that physical evidence findings in the truck were not consistent with Davies' testimony. In denying relief on this issue, the post-conviction court found that trial counsel's performance was adequate. We note that we are somewhat hampered in our review by the lack of a trial transcript in this case. Because no proof other than trial counsel's testimony was presented on the issue, we cannot conclude that the petitioner has carried his burden of showing that evidence preponderates against the court's finding.

### e. Failure to Challenge Search Warrant

The petitioner also asserts that trial counsel was ineffective for failing to challenge a search warrant issued in a separate drug case against the petitioner, which yielded the SKS rifle the State implied was the murder weapon in this case. According to the petitioner, trial counsel should have sought suppression of the evidence recovered, namely the gun, because "the search for drugs was just a ruse used by the Carroll County Sheriff's Department to gain access to [the petitioner's] home

to really search for weapons." He contends that it cannot be determined whether trial counsel would have been successful in suppressing the evidence because no proof was taken concerning whether the search was valid.

In denying relief on this issue, the post-conviction court stated that:

> A facially valid search warrant was executed which resulted in the ultimate seizure of evidence used by the State. Trial counsel did not challenge the search warrant. The proof does not support a legal basis to challenge.

Initially, we are constrained to note that the petitioner's argument is misplaced in that he asserts no proof was presented with regard to the search. This argument ignores the clear principal of law that it is the petitioner who bears the burden of proof in a post-conviction hearing. It was the petitioner's responsibility to present to the court any evidence supporting his argument. In this case, the petitioner failed to do so. The only testimony given with regard to the search of the home came from the petitioner, Agent Byrd, and trial counsel. Agent Byrd testified that it was a controlled buy situation which led to the warrant being issued and, further, that he had instructed the officers executing the warrant to limit themselves to a search for narcotics. Trial counsel testified that he had reviewed the search and that, in his opinion, a motion to suppress would have been frivolous as he believed that no valid ground existed for the challenge. The petitioner, when testifying, could only state that he thought the evidence should have been suppressed, but he could assert no legal basis as to why. Based upon this proof, we cannot conclude that the post-conviction court erred in its finding that no legal basis to challenge the facially valid warrant existed.

### f.       Failure to Renew Motion for Change of Venue

The petitioner's next claim is that trial counsel was ineffective for failing to renew a motion for a change of venue. It is not disputed that trial counsel originally filed the motion, which was denied but then held in abatement until jury selection began. Trial counsel failed to renew the motion, which resulted in waiver. At the post-conviction hearing, trial counsel testified that he chose not to renew the motion because he was satisfied that a fair and impartial jury had been selected. However, the petitioner now contends that there were people on the jury with knowledge of the case which inured to his prejudice. He states in his brief that "[r]aising the venue issue again would have put the trial court on notice of the potential taint to the jury pool and could have led to increased scrutiny of the venire by all parties and the trial court."

In denying relief on this issue, the post-conviction court found that "voir dire did not support such a motion," and we conclude that nothing in the record preponderates to the contrary. Both trial counsel and Mr. Overton, the State's attorney, testified that it was relatively easy to select a jury which appeared to be fair and impartial. Additionally, trial counsel testified that he was aware of the knowledge expressed by certain jurors, but each had expressed that it would not affect their verdict. As a result, trial counsel testified that he felt no suitable ground to renew the motion existed. Moreover, trial counsel did raise the issue on direct appeal. While a panel of this court concluded

that the issue had been waived by trial counsel's failure to renew, the court, nonetheless, addressed the issue and likewise concluded that it was not a meritorious argument. A panel of this court noted that:

> [T]he record reflects that the jurors were questioned thoroughly about pretrial publicity and each juror was either unaware of the case or gave assurances that they could be fair and impartial when rendering a verdict. The record also reflects that after the jury was selected, the [petitioner] assured the court that the jury was to his satisfaction. Accordingly, the [petitioner] has clearly not met his burden of proving prejudice; and as such, we conclude that the trial court did not abuse its discretion in denying the [petitioner's] motion for change of venue.

*Hanebutt*, No. W2005-1301-CCA-R3-CD. Thus, it has been previously determined by this court that no ground existed which supported the motion. As such, the petitioner has failed to carry his burden of establishing either deficiency or prejudice and is not entitled to relief.

### g.       Failure to Object to Statement in Voir Dire

The petitioner also asserts that trial counsel provided deficient representation by failing to object to a statement made by the prosecution during voir dire concerning other murders which had occurred in Carroll County around the same time. According to the petitioner, this failure to object tainted the jury pool and, when considered in conjunction with the failure to renew the motion for change of venue as discussed above, "calls into question the bias of the jury pool."

In its written order, the post-conviction court found that the prosecution had made no objectionable statements, and we agree. Mr. Overton testified that he did reference other murders pending in the county at the time but believed that, due to the publicity at the time, it would be improper not to do so. He testified that he made the statement in an attempt to focus the jury on the instant case. Moreover, trial counsel testified that he did not feel that the statement was objectionable. Additionally, both Mr. Overton and trial counsel stated that they had little difficulty selecting the jury and were satisfied that the empaneled jury was fair and impartial. The petitioner has simply failed to put forth any evidence which preponderates against the post-conviction court's finding.

### h.       Failure to Request Additional Jury Instructions

Next, the petitioner contends that trial counsel was ineffective by failing to request further jury instructions on the credibility of witnesses and how it could be affected by drug usage. He notes that most of the witnesses at trial were heavy users of methamphetamine and other drugs and that testimony was given throughout the post-conviction hearing as to how this could have affected their testimony. While we are hampered in our review because no copy of the jury instructions was entered into the record, we note that trial counsel testified at the post-conviction hearing that he recalled that the jury had been instructed on the limited use of evidence concerning prior bad acts,

-22-

*i.e.*, drug usage.

Initially, we are constrained to note that the petitioner makes this assertion without citation to the record or authority, which results in waiver of consideration of the issue. *See* Tenn. Ct. Crim. App. R. 10(b). Moreover, our review of the voluminous transcript reveals that no evidence was presented at the evidentiary hearing establishing that these requests were warranted by the proof at trial. Absent proof from the petitioner that these instructions were warranted, he is precluded from establishing either deficiency or prejudice.

## I.      Cumulative Effect

Finally, the petitioner asserts that the cumulative effect of trial counsel's errors warrants a finding of ineffective assistance. Having concluded that the record supports no single finding of deficient performance, this issue is also without merit.

## CONCLUSION

Based upon the foregoing, the denial of post-conviction relief is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE